My name is Anne Traum, and I'm appearing on behalf of Tyrone Givens today. Before I start, I just want to note a few housekeeping matters. First of all, that I submitted a 28-J letter earlier this week to the panel. It was faxed on the Alpha Rahim case, which regards, during instruction in this case, his Givens intoxication defense. And then the second matter is that today in court I submitted an additional citation to a case called Crane v. 8th Judicial District, a Nevada case that relates to procedural default. I just wanted to alert the panel to those. I would like to reserve four or five minutes for rebuttal. I will try to keep my eye on the clock. My client, Tyrone Givens, who was just 18 at the time of the alleged incident, is serving 95 years in the Nevada prison system for attempt robbery and attempt murder. Three weeks before his trial, Givens moved to dismiss his lawyer because he had never come to visit him in jail. Four days before the trial, his counsel said that he was ready for trial. When my client went to a status conference four days later, he thought it was a status conference. He appeared in jail clothing. They ended up picking a jury right then and there. His counsel did not object.  Until the next day, he came dressed in civilian clothing. Is there an affidavit or something in the record to show that, I mean, that your client said he didn't come voluntarily in prison clothing? Sometimes people like to do it for tactical reasons. There's nothing in the record that would support that it was for tactical reasons. He did object in his petition to Is there something in the record to show the contrary since you have the burden of this? I think what is in the record, he doesn't say, he does move for mistrial at the conclusion of the trial, and he says in his motion for mistrial on the record, and that's at page 249, 250 of the record, I didn't know I was going to trial yesterday. The second day, when he obviously knows he's coming to trial, he appears in his civilian clothing. So I think it's definitely fair to make the inference that he was surprised and unprepared, and had he known, like he did the second day, he would have dressed in civilian attire. There's nothing in the record, there's no statement by counsel or an affidavit of any kind, to suggest that this was strategic on the part of counsel to waive this objection. And the problem is, under Estelle v. Williams, that if they waive the objection, it's gone. So that's why this can only be framed as an ineffective assistance claim. But the error, the Estelle v. Williams error, is there, and I think that's a powerful error, that this court in the recent case of Leslie has described as inherently prejudicial to appear in prison garb. And in Estelle v. Williams, the Supreme Court said it's a continuous impermissible and continuous reminder that the defendant is in custody and cannot post bail. And this court emphasized, actually in Judge Bivey was part of the panel, that denied rehearing on Bank and Musladeen. And the court in that opinion, and the dissent for the Ambonk hearing, said that appearing in prison garb is very distinguishable from the Musladeen case, which involved buttons, picturing the victim, that the prison garb issue is so different because it's the unambiguous statement to the jury that the defendant is a prisoner, cannot post bail, and that the government believes that he must be detained. So that's what makes that claim in this particular case so powerful. I just want to move on. What is the prison garb that was described here in the case? What was it? Some prisons have big stripes, and some have khakis, and some have denims, and some have just clothes like everybody else wears. The state did concede on the record that, and that's at page 344, that he was in prison garb during jury selection. They don't say what it is. I don't think it's clear what it is. But it was clear that he was in jail at the time, and I don't think the practice has changed. In Clark County, when you're in jail, you're wearing an orange jumpsuit. When you're in prison in Nevada, then they wear the prison blues, which are normally denim with a shirt, jeans, and a shirt, very different than the jumpsuit. You're saying he wore the orange jumpsuit. Right. That's correct. Then at the trial, counsel doesn't really present any kind of defense. I think if you read the closing argument in this case, at best what counsel is setting up is a sufficiency of the evidence defense. As he goes through each witness's testimony and ID of my client and simply says, well, was that beyond a reasonable doubt? He totally ignored the strong evidence supplied by the uncharged co-defendant in this case, Wayne Williams. Wayne Williams, in his statement, says that he and Givens had been drinking heavily since 4 or 5 in the afternoon the day before. They continued drinking at 4 o'clock in the morning, or maybe it was 4.30 in the morning. They get kicked out of someone's apartment because Givens is acting up in a way that, according to Wayne Williams, is consistent with him being intoxicated. And Wayne Williams described what it was that each had drunk, and he said that Givens had drunk two 40-ouncers, J.B., which I assume is Jim Beam, and a quart of something called Cisco. That's a lot of alcohol. And also, Wayne Williams says that what Givens does when he's intoxicated is he's acting up. He describes in his statement, which is at pages 85 through 89 of the record, that he was cussing at the women that he was with, he was tripping, in quotation marks I say that, and that he got kicked out of the apartment directly before those two go to the park and this incident happens. There's a strong intoxication defense, which is never investigated. Counsel, would that defense have been contrary to the defense of misidentification that counsel did present? You're offering an intoxication defense. You may have to confess that you did it, but that you're not guilty by reason of intoxication. Correct. Well, I think there's a few avenues here. One is if you were offering a strong I.D. case. He never challenged, pre-trial, he never challenges the I.D. No one does. Prior counsel doesn't either. The defense that he's offering at trial is an I.D. defense, but it's so weak that he louds every single victim and every single witness. It's a four-witness case, two victims, two eyewitnesses. He louds them as being honest and then just sort of questions. Well, yes, he said that he saw him. Yes, he said that this matched exactly the description of a light-skinned black man who was young and thin. But then all he does with respect to that defense is, well, yes, but is that beyond a reasonable doubt? There is some tension there. But you think that a better defense would have been to come in and confess that he did shoot them, but that he was intoxicated at the time? Well, two things. One is that it's not clear that Givens is the guy because he has an unindicted co-defendant there, so it's possible that it is an I.D. case and he is intoxicated because there were two people there. So there is that possibility. But even so, he leaves this very powerful defense. And the problem is we don't actually know. We have a strong sense that it's powerful from this statement. We know that trial counsel has that statement. He says he does at trial. On page 226 of the record, he's talking about how he talked to Williams before trial about the fact that Williams wasn't going to testify, wasn't going to change his statement, which means that he also wasn't backing off the information in the statement that Givens was intoxicated. But he also never investigated those statements to find out how good they were. So he leaves that defense just lying. Excuse me. Sorry. Givens take the stand in this case. No. It would have been somewhat hard to put up an intoxication defense unless he at least took the stand, right? Well, there's a couple of things. It's good, but it doesn't go over too well. Right. There's a couple of choices that would have had to be made had his counsel even started to investigate that defense. That was the first step, was talking to Williams to find out about it. Williams also mentions other people who were there that night, who were with him in the apartment, who could have verified that he was acting up, for example. So he could have brought those people in had he investigated it and had that panned out. Givens was not charged, right? Givens is my client. The other person was not charged. Not charged. Right. If he had been called, he probably would have taken and invoked his privilege against self-incrimination. Wayne Williams? That's unclear to me because he was there. He was obviously in chambers because they talked to him during and it's not clear that he would have invoked if charges were hanging in the balance. Particularly when you suggest that Givens could have put the shooting off on him. I would think he was in grave jeopardy of being the defendant and any reasonable lawyer would have told him take the fifth and don't risk. So the whole intoxication defense would have been very hard to prove without his cooperation. Not necessarily because, again, one is that he is there waiting in the wings to testify. So there certainly is the possibility that he's going to get a great deal because he testified and that he would not plead the fifth for that reason. But additionally, this is also just failure to investigate. He's naming other people who are with them that night. They were kicked out of a woman's apartment. He was acting up and drunk. Was Williams intoxicated? Yes, Williams was also intoxicated. He seems to indicate that he didn't drink quite as much. And I didn't write those figures down. Was there anything in the testimony of the victims or the witnesses at the park that would have tended to show that Givens was intoxicated? Is there anything that if you had gotten Williams on the stand and you put the people from the apartment on the stand that you could have also said, and this is correlated because when the joggers run by, they see him staggering. They thought his speech was slurred. Or the victims didn't understand what he was asking them at first. They weren't sure he was asking them for money or whether he was asking them for directions because his speech was so bad. I mean, was there anything else that would have corroborated this? I don't think. I think that based on my recollection of the testimony that there isn't that. I didn't see corroboration there. But part of the issue here is that this is happening very quickly. Perhaps the very fact that he was trying to rob someone who's jogging, which is not a particularly wise decision, it seems, in terms of how much money people carry when they're exercising. That may be something that's just sort of strange. This was a 71-year-old who probably wasn't running very fast. Another reason why that wouldn't be a good choice. So I don't think that that corroborates it. I mean, the testimony isn't very sparse, and it mostly goes to the ID. The whole trial happens with four witnesses in one day, so I don't think they sort of go off track much in terms of describing his conduct. Well, there's a lot of criminal activity that's hard to explain sometimes. People rob people who obviously don't have much money, or they rob their own store and have a lot of cash. But that happens constantly, whether a person's drunk or not. Understandably. I mean, the problem is here is there's a strong indication of a very good defense to two specific intent crime charges, attempt robbery and attempted murder. And there's no investigation. I mean, the lawyer just completely leaves that unexplored. And, Wayne, it's not like these people were by themselves for the 12 hours prior to this time. They were actually socially together with other people since 4 in the afternoon and had just left someone's apartment by the park. There are other people. Wayne Williams was the gateway to those other people, and a very powerful gateway. But he was not the only person who could have given this information, and it's not clear that he wouldn't have given this information had that been explored with him. He just simply said that he was going to still implicate Givens in his testimony and had the choice been made to inquire into this intoxication defense, even if the testimony were the same as the statement, it would have still been powerful evidence that if Givens did it, he did it when he was intoxicated. One problem that you haven't touched upon is that, as I understand, the State claims that you're procedurally defaulted for failing to file in time. I guess you need to get over that hurdle before you can get into anything else. Let me, I just want to, I think the best way to do this, I think that the district court had two different decisions on this point and that they were both correct. Let me just walk the court quickly through the record citations. On page 311, in his affidavit supporting what was a motion to show cause, why he was causing prejudice to file his petition, my client says that he sent copies to the AG, to the DA, and to the court clerk. He followed, attached to that document was a, attached to his petition, which he attached to as an exhibit to that document, was a certificate of service, showing proof of service to the AG, the DA, and the court. I mean, not to the court, just the AG and the DA. And the Nevada Supreme Court, I mean, excuse me, the State acknowledges that the AG did, in fact, receive it. That's on page 338 and 339 of the record. Three days after Gibbons mailed it, that is strong evidence that Gibbons did what he said he did. And, in fact, it's clear from the certificate of service that what he did was he said that he served the AG and the DA. What we're missing is evidence, is any evidence other than his say-so that he served the clerk. And, in fact, the certificate of service would seem to contradict that, wouldn't it? No, because on my briefs to the Ninth Circuit, I never put the Ninth Circuit on my certificate of service, nor am I required to. I file with the Ninth Circuit, and in my certificate of service, I say who I am mailing copies of my briefs to. And that's exactly what the rule is in Nevada. That's exactly what Gibbons did. So this actually corroborates that on that day, when he was doing this, he actually was putting these things in the mail. He also follows up to the AG, the DA, and the court. So it appears that he was clear that he understood that he had to file with the court. He followed up with the court in two separate letters to find out what the status was of his petition, and nothing happened. Under Nevada law, all he's required to do is to allege those facts that say that he tried. This is at a time before they prohibited the mailbox rule. And the case on point on that is Gonzalez. Gonzalez makes clear that before Gonzalez, it was not clear that you could not avail yourself of the mailbox rule in Nevada. And the State does not concede that my client did what he said he did. They just placed the emphasis on the fact that there was no file-stamped copy. Well, the issue is not whether there's a file-stamped copy. The issue is whether he actually mailed it, whether he handed it off to be mailed. Is that a question of State law as to whether he effectively served process in time? It is an issue of State law. Here, the Nevada Supreme Court hung him on the fact that he served the AG, and they said he only served the AG. They made that finding illegally, in our view, under State law because there was nothing to rebut his contention. There was no evidentiary hearing. The only way to get to the Nevada Supreme Court's conclusion is to make a factual finding without an evidentiary hearing on that point. And it's an unrebutted point in the record. That's a problem. If we take your point of view, then we're finding that the Nevada Supreme Court made an erroneous finding of fact, I suppose. Erroneous finding of fact deserves no deference. That's what the district court did in this case. The district court could have said that, given simply complied with the Nevada Supreme Court's rule, I mean, with the applicable rule 34-726, that he complied with it and there was no violation and, therefore, no procedural default. That was an argument that I put forth. But the district court just took a different route and said that this was effectually cause and prejudice under Murray v. Carrier, the federal standard. So it took a slightly different route. It could have simply said that given complied with the rule and, therefore, there was no procedural default because there was no violation of the procedural rule and no deference due, which is what the district court said, to the Nevada Supreme Court factual finding on that issue because it was unreasonable in light of the record before it. So I would like to reserve my two minutes, if that's okay. Okay. Thank you, Ms. Traum. Good morning. My name is Vic Schulze. I'm the Senior Deputy Attorney General for the State of Nevada. It's an honor to be here today. I think the procedural default issue, as the judge indicated, is a gateway issue for us today, and I think these default issues are important for us to respect in this habeas process. So how do you respond to counsel's argument that on a certificate of service, we only indicate to the other people that we're serving, not the principals to whom the document is addressed? I would respond two different ways, and they're somewhat contradictory. My experience is that in dealing with the hundreds of pro se petitions I've received in the last 12 years, it almost always happens that the court address is on there because under the mailbox rule and the Houston rule and the Huizar rule that's cited in this case, because the defendant has to mail the petition rather than taking it to the court, he generally will list, he or she will generally list all those names. Although I would concede to the court that that form did not have a specific line for the address of a court, and that is not on there. I would suggest, though, however, that the district court erred in a couple of areas on the issue of procedural default as matters of law and matters of fact. The first issue, let me just stop you there on the question of your experience. That would seem to be contradicted in this case, though, by Mr. Givens' own testimony that he served all three, and it doesn't seem unlikely or an unfair position, even though Mr. Givens is youthful and not an attorney, that he's done what counsel in this court usually does. That is, they put the addresses of everybody else other than the court on their certificate of service. But what do we do with the fact that he has testified that he did serve the court and that what he's done is a common practice for attorneys in this court? I don't think he testified. I think this is nothing more than an allegation in the petition. Okay, well, whatever. He has in some way indicated that he is willing to come forward and say I did this, and he does follow up. He's also alleged that he followed up with the court to find out what happened to his petition. Indeed. So he certainly is acting as someone who thought he had properly filed. Conceitedly. Yes, he is. I would suggest, though, that the fact that the attorney general, the letter is before you in a couple places in the excerpts of record. The letter from the attorney general informing Mr. Givens that our office wouldn't respond, that the DA had to respond, was from a former supervisor of mine, David Sarnowski. And I think that the receipt, I agree with the Nevada Supreme Court, that Mr. Sarnowski's recognition that our office had received, the attorney general's office, had received a copy of that document shows, in fact, that what Mr. Givens did was he served that document on lawyers. He didn't mail it because whether he alleges he mailed it himself, which was the allegation in the motion to show cause and prejudice, or whether the district court properly applied the mailbox rule under the theory that Givens handed that document to a prison, some unnamed prison official, we don't know who that is. Whoever Givens wanted to get that document got the document, and the proof of that is that the attorney general got the document. It's highly unlikely that only some of the people got the document, but not everybody did. And I would suggest that because of the certificate of service, because of Mr. Givens' youthful age. Yeah, although that's a tough position to take, that because you got the document, that had he, in fact, mailed it to somebody else, that they would have also gotten the document. I'll concede it's not the strongest argument in the world, but I think it's some evidence the Nevada Supreme Court can look at and say, you served the document, you simply never filed it. Because it raises that question. Keep in mind, under Nevada law, under Chapter 34, it's Givens that's got the burden to show cause and prejudice. The state doesn't have to show a lack of due effort. He has to show cause and prejudice for this filing that ultimately was four or five years late in this case. And so I don't think the Nevada Supreme Court was unreasonable in looking at that record, the lack of a filing, the fact that the AG actually got it, and the fact that the court is not on that certificate, as sufficient evidence to show that, in fact, he never sent one to the court. What's our standard for reviewing that issue when the Nevada Supreme Court found that it was not timely filed? Do we look at it as clearly erroneous, or do we give any deference to it, or what do we do with it? It's a difficult issue because the district court made an interesting finding. The district court seemed to find that the Nevada Supreme Court, and you'd asked a question relevant to this a few minutes ago, the U.S. district court seemed to make a statement in its order, denying my original motion based on procedural default, that the Nevada Supreme Court erred in finding, as a matter of state law, that cause and prejudice was not found. I don't think a U.S. district court can make a finding that a state court erred in the application of state law, in this case, which would be whether or not he met his legal burden for cause and prejudice. That, I think, is a problem. I would also suggest that the U.S. district court erred in misreading that Gonzales case. He read Gonzales. Judge Hicks read Gonzales to read that a petitioner's allegations of cause and prejudice are presumed to be true, sort of like the last case you heard where somebody does something like a motion to dismiss under, or a motion for summary judgment under the federal rules. In fact, that is a misreading of Gonzales. As we pointed out, what happened in Gonzales was the Nevada Supreme Court simply assumed arguendo. If the facts in that case, if Gonzales, in fact, had done what he said he did, he still doesn't get relief. Under Chapter 34 of the Nevada Revised Statutes, it is always true that cause and prejudice is a burden that must be alleged and proved and shown by the petitioner. And I think to the extent that the district court improperly relied on a misreading of Gonzales and the assertion that the state court misapplied state law, which I don't think a federal habeas court can ever do, I think what Judge Hicks did with the procedural default issue is probably questionable at best in this case. Having said that, I'm in the enviable position here also of, in addition to having the procedural default argument, the fact that Judge Hicks agreed with us in the ultimate disposition of this case. And if the court would, if it would help you, what I'd like to do is address very briefly the issues that are before the court on the three issues. On the identification issue, I think it's a misreading of the law in the opening brief that somehow a show-up identification under Neal v. Biggers has to be based on exigent circumstances. This court has found that is not true. It is not true that a show-up identification by the police is inherently unduly suggestive, which is alleged in the opening brief. It is also not true that the police have to come up with exigent circumstances or urgency. This court in the Kessler case specifically found the opposite. There is nothing inherently improper with a show-up identification. If you go through the five standards, those five points in Neal v. Biggers, every one of those goes for the state, and we think the district court made that ruling properly on the show-up identification. The show-up identification was by the two neutral witnesses, one of whom was jogging in the park, one of whom was walking, both who testified that that show-up identification occurred only 45 minutes later and maybe six, seven blocks on a street called Comstock Street, also in the neighborhood where the robbery and the shooting of those two victims took place. The full-face view of Gibbons in this case, there were two African-Americans involved. Not only did the two neutral witnesses, but also the young woman, the daughter of Luther White, LaBertha Valmore, also testified that Gibbons was the man at the preliminary hearing and at the trial. She testified Gibbons was the man who shot my father and shot me, and at the prelim she was asked, and that's in the EOR that you have, she was asked by the defense attorney, notice she was asked this at prelim but not at trial, how sure are you? And she said, I am very sure that's the man that shot my father and shot me, pointing at Gibbons, and that was corroborated by the testimony of the two neutral witnesses when Mr. White, the 71-year-old shooting victim in this case, I point out he was shot in the leg and shot in the neck, ended up in a wheelchair and had to have multiple surgeries in that time frame prior to trial. Mr. White was asked what were the lighting conditions like in the park. It's 4.30 in the morning. It was August. As those of you know, those of us who live in Las Vegas or visit, we get a little warm in August. A lot of people do physical things early in the morning around sunrise. It makes a lot of sense. They were out walking through the park, and all the lights in the field were on. The place was lit up like Shea Stadium. According to Mr. White's testimony, all the park lighting was on. He wasn't sure that Gibbons was the person, though, did he? I would concede to you that at trial his identification was mushy. He said what I think his exact testimony was, well, that looks like him there, but concededly he's at counsel table. The park lighting, this was a Doolittle Park? Doolittle Park. Did that include the ball fields? I don't know. The question was what were the lighting conditions, and his response was all the park lights were on. And so from the testimony of the birth of Elmore, who was the victim who was shot in the head, the daughter, and the two independent witnesses, Johnson and Otis Harris, I think is his name. There was no question in their testimony. It was a direct examination, direct identification, no hesitation. They had an opportunity to view. The show-up identification was just 45 minutes later. Moving to, if I could, moving to the failure to object to the jail garb clothing issue, I do not read the record as indicating that the district attorney ever conceded that Mr. Gibbons showed up in jail garb. That fact has never been established. It's nothing but an allegation. In the opposition to the state post-conviction petition, again, I think what the district attorney said was arguendo. Didn't use that word, I concede. But the argument read reasonably was arguendo if he had, there was no prejudice. I've got to be honest with you and tell you, in a Clark County district court, I find it highly unlikely that some guy is going to show up for jury instruction in an orange jail garb. And, of course, we don't know if it was orange or green or purple or if he looked, if it was. Oh, the allegation is that he thought he was there for something else, and it turned out that they were going to start selecting the jury. But there's a problem with the allegation. If you read the allegation both in the state petition and the federal petition, they don't allege state compulsion. That is a mandatory element. As Your Honor testified, the U.S. Supreme Court has said, sometimes it happens that these guys want to engender sympathy by showing up. You know, I've never been a defense attorney. I concede that would kind of be a strange strategy, but apparently sometimes it happens. But the fact of the matter is one of the mandatory elements here is compulsion. They've never even alleged compulsion. In fact, what he alleged was essentially, oh, my mistake, sorry, I didn't realize this was jury selection. I thought it was something else. That seems to me to indicate it was his negligence, not the judge and not the DA or not one of the bailiffs or one of the jail COs who required him to show up in jail guard, and that's an important distinction. The defense counsel or petitioner's counsel here suggests that there was something in the record the next day where he objected, made a motion for mistrial or something, because he was in prison guard the previous day. Is that in there? I don't see. I've never seen anything in the record where this issue ever came up. That's the point. There is no factual basis for this issue. There was no objection. The allegation is he then showed up in street clothes and that, not unlike my logic where the AG got the letter and the court didn't, it's sort of an indirect reference, and it's not logically not different from my own argument. But the argument is, well, look, the next day he showed up in street clothing, therefore he must have been in prison clothing the first day. It's not clear what the argument is. But, in fact, it's never been established there was no objection. And although we may in Clark County have quite a range of talent within the defense community, I don't know of a defense attorney who either wouldn't object or would think to himself, no, let's engender some sympathy here. But the relevant issue here from the U.S. Supreme Court case law that the district court, I think, I think ultimately that's probably the most important issue. Lastly, on the involuntary intoxication defense, if I might, under state law, voluntary intoxication is a defense under Nevada law to a specific intent crime, and the attempted murder counts are voluntary or involuntary. I'm sorry, did I say involuntary? Voluntary intoxication is a defense to a specific intent crime, not to a general intent crime, but a specific intent crime, and the attempted murder is a specific intent crime under our law in Nevada. Again, though, there's a problem here. In the opening brief, counsel concedes only that it was, quote, likely that Givens was intoxicated at the time. Likely intoxication is an insufficient allegation and would be an insufficient showing. I would also suggest that under Nevada law, intoxication is not a defense in this case. As counsel concedes in the brief and the Dierman case from the Nevada Supreme Court demonstrates, you have to be so intoxicated that it negates the specific intent to commit the crime. It's not enough that you're drunk. It's not enough you've had a couple of beers or a martini. You have to be so strung out on alcohol or drugs, you can't form the intent to commit the crime, and I would suggest the best evidence that shows that's not true is simply going back to Doolittle Park and looking at what this guy did. Walks up to two people who were walking at 4.30 in the morning, a 71-year-old man, easy target, I might add, and his 40-, 45-year-old daughter, points a gun at him. Initially, he has got the gun at his side. He demands money. They say, we're jogging, we're walking, we don't have any money with us. Points the gun at them, demands money again, demands money repeatedly. I would suggest the repeated demands show he knew exactly what he was doing, he knew what he wanted, he knew how he was going to get it. He gathered his weapon, he loaded that weapon, he was ready to go, he got himself to the park. A lot of complicated mental activity going on. At one point in time, LaBertha Valmore testified she opened her pockets to show him, we don't have any money. Thereupon, he shot her father twice, once in the leg and once in the neck, bullet exiting under his ear. She fell on him to protect him from being shot further and given shot her. Shot her in the head, it was a flesh wound, it didn't go into her skull, but shot her in the head and it caused her to end up at University Medical Center for medical treatment. His injuries were very severe. He showed up at trial months later in a wheelchair after three surgeries, according to his testimony. So the facts of that case, I think, negate the inference that having had some alcohol the night before somehow would have been a successful defense. Under Bogue v. Rains, counsel is never, under Strickland, counsel is never ineffective for failing to raise a meritless objection or motion or issue. And I would suggest that because of the law and the requirements in these three issues on the merits, none of these would have been successful. Therefore, Gibbons can show neither defective performance of counsel or prejudice under the Strickland Promise. Thank you very much. Okay, thank you, counsel. Ms. Strom, you're reserved a couple of minutes. Thank you. On procedural default, I just want to be really brief and just clarify that the rule that Gibbons was operating under when he served the DA and the AG was Rule 5B of the Nevada Supreme Court rules, which just requires proof that you serve the other parties in the matter. There are no special rules for pro se defendants. There are no special rules for people who are filing from prison. And what would be the point of the mailbox rule if you had to show that the thing that you filed was timely filed? Then you wouldn't need the mailbox rule. What you have to show or allege, which is what he did, was that I sent it on this date. And what corroborates that is that the AG at least got it. Now, I cited the Crane case today, and that's a case that talks about how when you file, when at least it was against the court clerk in Clark County who failed to file a document, a notice of appeal that she received from a pro se defendant, and she just returned the filing, unstamped, to the defendant, and the Nevada Supreme Court had to order her to file the document. And because she didn't even have a copy of the document, she had to use her letter of acknowledgment of receiving the document as proof of the notice of appeal. That's an example in Nevada how you can send something to a court and it never gets filed, and no one knows whatever happened to the document. On the – I also do – I did cite to Gonzalez and Phelps. There are two cases in Nevada that talk about procedural default, and Phelps in particular talks about how you can't summarily dismiss when the petitioner has made allegations. In this case, those allegations are unrebutted in this record that he did what he said he did, which is that he put it in the mail. That's what he has to show, and that's what he alleged, and it's unrebutted. And then just on the intoxication defense, very briefly, there's no strategic reason ever given in the record for why counsel did not investigate whether Givens was intoxicated. And the standard under Wiggins and Strickland is that every decision not to investigate has to be reasonable. There's no justification in the face of strong evidence that he was intoxicated that that was a no-go defense, that he chose not to pursue that for a strategic reason. And in the absence of that kind of strategic deliberation, there's nothing – you can't base – If it was based on a strategic reason that's in the record that was actually proffered, different story. But there's no such proof in this record. What's in the record is that he has a co-defendant uncharged who says at 4.30 in the morning, right before they were at the park, that they were kicked out of someone's apartment for cussing and tripping and yelling at people, which is what Givens does. Ms. Trump, this, of course, would have been problematic, assuming we could get past the Fifth Amendment issues in terms of Williams testifying. Once Williams – if Williams goes on the stand to testify about intoxication, we're going to be able to ask him about fingering Givens as the shooter, aren't we? Sure. But the thing is, he's never investigated. So could you play that out, where you have Williams on the hand? Well, to say he hasn't investigated is not the same as saying he's never thought about it. Well, in this record, we don't know that he ever thought about it. On this record, we don't know that he investigated. We don't know anything, because no strategic reason has ever been proffered anywhere in this record. Has he filed an affidavit or testified about this? No. This is also an uncertified issue, so you've got an additional hurdle to get over on this one. I understand that, and I recognize that, but because the state briefs us, at least the court has what it needs to decide this issue. So in working that out, failure to investigate leads to whether to put Williams on the stand. No need to put Williams on the stand if you've got other people who Williams refers to in his statement that have seen Givens that night, the person, for example, who just kicked him out of the apartment. But even if you put Williams on the stand, you just have a different strategy, which is that Givens is the person who did it, and he was intoxicated. So, I mean, that's a decision that could be made, but the problem is you don't even have that gateway issue, which is nobody investigated it. There's no proof that any investigation was done on this powerful issue, and there's no strategic reason in the record ever given as to why this wasn't explored. So with that, I'll close, and thank you very much for your attention. Thank you. We thank both counsel. Givens v. Del Papa will be submitted. The court is going to take a brief recess. I want to advise counsel for Motorola v. J.B. Rogers Mechanical that we will return in a few minutes with a different composition of this morning's panel. So we will be back this morning probably before the noon hour. So we will stand and take a brief recess.
judges: Noonan, Siler, Bybee